Good morning, your honors. My name is Kevin Morton. I represent Thomas Bowers in the Social Security Disability Appeal. Mr. Bowers has chronic fatigue syndrome. Could you explain to me, since the state of play, given the fact that you have abandoned your waiver argument, the commissioner argued that there was no definite diagnosis of chronic fatigue syndrome. And you are abandoning your contention that they are unable to argue that, that they are able to advance that argument. They can advance that argument, that's correct. And so, okay, so the, and you didn't actually confront that argument substantively in your reply brief as I understood it. You based your, you didn't argue, as I understood your reply brief, that there was a diagnosis of chronic fatigue syndrome in the record. What you did, as I read it, was to simply argue that the That's correct, your honor. Well then, what, since you haven't actually challenged the underlying determination. We have, your honor. Okay. We've challenged it because we said that the ALJ's analysis of chronic fatigue was legally insufficient. They did not, the ALJ in this case, did not apply Social Security ruling 99-2P to the evaluation of chronic fatigue syndrome. I didn't know that. He doesn't say it in his decision. No, it reaches a conclusion that there was no diagnosis. Right. But 99-2P. There was no diagnosis and you look at the record, a doctor mentions that he has chronic fatigue and doesn't list any of the manifestations, doesn't list it went on for six months, doesn't, and it's intermittent. It only appears, I think, once or twice. And most of the other times he comes, he doesn't even complain about that. So the question is, to have a chronic fatigue syndrome, 99-2P requires a bunch of characteristics about it. 99-2P does not actually require a diagnosis of chronic fatigue syndrome. What it does... No, it says how you diagnose it. In other words, you need a diagnosis by a doctor and then the doctor has to have support of the manifestations that are listed in that. Judge Niemeyer, I don't believe it actually requires a diagnosis. What 99-2P does is provide a method of proving that you have a medically determinable impairment. And that's the error in this decision. The ALJ never considered the medical signs that you mentioned. The ALJ never considered the lab report. The ALJ never interacted with that. I didn't know he didn't consider all that. He didn't talk about any of it. He mentions fatigue three times in the decision. And the reason he does that, I think, is because the parties agree here that the ALJ did not find chronic fatigue. Does the record support that there was a diagnosis of chronic fatigue syndrome? According to the ruling, it does. The record? 99-2P. Where in the record? I don't... Okay. Can you show me in the record a diagnosis of chronic fatigue syndrome? No, ma'am. I cannot do that. What we have to show is that chronic fatigue syndrome is a medically determinable impairment. You don't need a diagnosis. I don't believe we do. Dr. Malone's... Your authority for that proposition is what? Well, I would analogize it to something... I'm sorry. If you don't have specific authority, then please go on. But are you saying you don't have specific authority? I'm saying the ruling itself does not require a diagnosis of chronic fatigue syndrome to establish the existence of a medically determinable impairment. The ruling says that if you have a medical sign or a laboratory finding listed in the ruling, then you have established a medically determinable impairment. Now, Dr. Malone, who evaluated Mr. Bowers, said he has the Epstein-Barr virus titer, which is one of the ways you can establish a medically determinable impairment. Right. The problem we have, of course, is we don't have the lab report, but we have his interpretation of that report, which is to say that it is significantly elevated and that he connected that to Mr. Bowers' chronic fatigue. He being Dr. Maloney? That's correct. And the district court found that that was sufficient. I thought he said it was possibly associated with... Initially, in September 2004, he said possibly. In October 2004, he said probably related. There is a connection, although, again, the ruling does not even require that a physician make a connection between the medical signs that the ruling describes or the laboratory finding. What do we use to decide whether someone has chronic fatigue syndrome or not when there's been no formal diagnosis? Currently, you would use Social Security ruling 14-1P, which replaces 99-2P. Which says? 14-1P is different from 99-2P. It seems to indicate that you would require a diagnosis of chronic fatigue. But both rulings make this distinction. They say that CDC criteria, which a physician can use to establish a diagnosis, can rely solely on subjective reports from the patient. The Social Security Administration says that's not sufficient. We need medical signs and laboratory findings. And here are the ones that we think. And this is a non-exclusive list in this ruling. These are the ones that can establish that fact. But there are others. And that's why I think the district court felt like Dr. Maloney's interpretation of that lab report was sufficient. Because it showed significantly elevated titers. So even though we don't have a diagnosis, a formal diagnosis, because Dr. Maloney says chronic fatigue and doesn't use the word syndrome, we do have a lab finding. And we do have evidence that supports the idea that Mr. Bowers had a medical sign that was sufficient under the ruling to establish that chronic fatigue was a medically determinable impairment. Is chronic fatigue syndrome and Epstein-Barr syndrome, are they different or are they one and the same? They are different. It's a systemic disorder. They're not really sure about the ideology, Your Honor. So an elevated Epstein-Barr virus titer is one indication. Elevated Epstein-Barr readings wouldn't bear on the chronic fatigue syndrome? It does under the ruling. So if it's elevated up to a certain value, it's considered to establish the existence of a medically determinable impairment. In the absence of a medically determined diagnosis, I want to come back to the basic point. What is it that we, what is there in the record from which we can determine that you have, your client has chronic fatigue syndrome to the extent of it being a medically determined impairment? He certainly satisfies the medical signs related to muscle tenderness. In September 2003, he was evaluated by a rheumatologist. He had 18 of 18 tender points. The rheumatologist thought he had fibromyalgia, but footnote three of the ruling suggests that tender points which establish a diagnosis of fibromyalgia can also be used to establish a diagnosis of chronic fatigue. Then in July of 2004, September of 2004, and October of 2004, Mr. Bowers, Dr. Maloney observed tenderness of muscles. So you have more than six consecutive months of evidence of repeated muscle tenderness, and that's sufficient to establish, pursuant to the medical sign under the ruling, that chronic fatigue syndrome is a medically determinable impairment. What standard of review do we use to determine, to review the magistrate judges or the district judges finding that medically, that there was a medically determinable impairment? He did. Okay. Now, what standard of review do we use with respect to that? Well, you have the power under 42 U.S.C. 405 to find that we've established that Mr. Bowers has a medically determinable impairment. So it's a substantial evidence determination of the magistrate judge finding that he had the chronic fatigue syndrome. Well, under Radford v. Colvin, the court said under the substantial evidence standard, you need to understand what the ALJ's reasoning was. And here, we don't have that reasoning. Why not? I'm talking about the magistrate's decision. As I understand it, the ALJ didn't find that there was chronic fatigue syndrome. The magistrate judge did. And he did it based on his evaluation of the ruling. Given, what are we, what's the standard of review in all this? Are we just reviewing the ALJ's findings? That's correct. Well, the ALJ did find severe impairments. He found degenerative disc disease, cervical spondylosis, recurrent headaches. And he also concluded that while the medical record does show that the claimant complained of fatigue, it doesn't show a diagnosis of or the factors that would lead to the serious medical impairment. He doesn't say that, Your Honor. In his section under severe impairment, all he says is there is no diagnosis of chronic fatigue syndrome. That's all he says. He does not discuss the evidence related to the lab finding. He doesn't discuss the laboratory finding of an Epstein-Barr virus titer. He doesn't discuss the evidence from September 2003 to October 2004 of muscle tenderness. But there was no evidence of the, was the evidence of the lab finding in the record below? Yes, it was. Well, the lab finding, the lab report itself is not in the record. But the doctor reviewed the lab report. So you don't really have the numbers, you don't have the numbers to see if it's equal to or greater than the titer than necessary. That's right. But the error here is the ALJ's failure to evaluate the evidence according to a ruling that is binding on all components of the Social Security Administration by regulation. Well, why wouldn't part of the error be the failure to include in the record documents needed from which to make that the record, we still have, we have established via medical signs that our client, Mr. Bowers, has a medically determinable impairment. The medical signs related to muscle tenderness. We have established that. And you don't have to have both. You don't have to have a medical sign and a laboratory finding. You can have one or the other. So the lab finding simply tends to support the idea that the medical sign itself was sufficient and the lab finding just means that, yes, there's more evidence to suggest that Mr. Bowers, in fact, has chronic fatigue. Pursuant to the ruling, he has a medically determinable impairment. But the medically determinable impairment is related to muscle tenderness. The medically determinable impairment is chronic fatigue syndrome. It's established by the evidence of muscle tenderness over a six, at least a six, clinically documented over a six consecutive month period. And that's sufficient? And that's sufficient under the ruling. But the ALJ never evaluated the ruling. At least his decision gives no indication of that fact. Why did you abandon your Thomas V. Aron argument that there was no objection to the Magistrate's determination that this was a medically determinable impairment? I don't think it's correct, Your Honor, in hindsight. It what? I don't believe it's correct in hindsight, frankly. What's correct? Your Thomas V. Aron argument? Right. The argument we abandoned in our reply brief. But I believe we have enough here to show that the ALJ made an error in finding that chronic fatigue syndrome was not a medically determinable impairment. To determine that was an error, what do we have to conclude? To determine that was an error, we have to conclude there was no substantial evidence to support it, right? You have to conclude that the ALJ's analysis was legally insufficient. And under Radford, it is. Well, that's a different analysis than whether there's substantial evidence. Because the ALJ did make a finding. And basically, he didn't give much explanation for it. But if we look in the record, it seems to me the standard, if you're looking as to whether there's substantial evidence to support his finding, that's a pretty... Now, this is what Radford says, Your Honor. It's legally insufficient. Because if you don't understand the reasoning, if the judge hasn't pointed to evidence, then it's impossible for this Court to say that substantial evidence actually supports that finding. That was what Radford was all about. In Radford, the ALJ had... Except I went to look for a diagnosis of the syndrome, and I couldn't find it. And I suppose that the ALJ made the same effort. And so if there's no evidence... Well, there's plenty of evidence. The ALJ just never interacted with it according to the ruling. And he's required to do that. But the plenty of evidence that you're referring to goes back to the fibromyalgia tender points? The tender points, Your Honor, Judge Lincoln, and the muscle tenderness. But who concluded that the... I mean, you're putting together little pieces from different parts of the record which are... Fatigue shows up intermittently two or three times in the whole record over the whole period. Oh, no, no, no. Two or three times in the ALJ decision. Probably 40 or 50 times in the record. May us look at exaggeration. Maybe 25 to 35 times in the record over an eight-year period. Anyway, somebody has to conclude and make a diagnosis that this is the syndrome in accordance with if we're going to look at 99-2P. And no one made that diagnosis. The doctors all called it chronic fatigue or fibromyalgia. And based on self-report? I mean, they didn't... No, based on lab findings, based on medical signs such as muscle tenderness. Again, Dr. Maloney says there's an evaluation by a rheumatologist, there's an evaluation by Dr. Maloney, and over a one-year period, he has muscle tenderness, which is sufficient to satisfy the requirement of the ruling with respect to whether he has a medically determinable impairment. So the ALJ in this case never reached the analysis of whether Mr. Bowers' chronic fatigue was a severe impairment because he didn't even think it was a medically determinable impairment. And that means that the ALJ never considered fatigue in assessing my client's residual functional capacity. Because you only consider symptoms and limitations related to medically determinable impairments. I see my time is up. I'd like to reserve some time for rebuttal. Thank you, Your Honor. So to begin, Your Honors, I would like to pick up on the issue of the medically determinable impairment, but then I would also like to move on to address the issue of even if, for the sake of argument, chronic fatigue syndrome were established, the ALJ effectively dealt with the allegations of the underlying symptom of fatigue in the RFC assessment as well as the credibility assessment, as supported by medical opinions. First, though, to deal with the issue of the medically determinable impairment. Now, as the Posting Council had indicated, I do not necessarily know that SSR 92P includes the word diagnosis when describing a medically determinable impairment, but the nature of a diagnosis is implicit in the SSR. Because what the SSR is ultimately concerned with is looking to the accepted medical practices and diagnostic techniques and ensuring that there is evidence underlying in the record that is capable of supporting the existence of chronic fatigue syndrome. Therein is implicit a diagnosis, and the lack of a diagnosis in the record is reflective of the fact that no medical source had sufficiently nailed down the existence of chronic fatigue syndrome as a diagnosis. So that's, even if not directly included, it is nevertheless important in framing this issue that there is, as Your Honors observed, no diagnosis. How does somebody who has four severe impairments not qualify for disability payments? I mean, you read the list, you look through the record, this guy is afflicted with a variety of ailments. I mean, just at the start, you know, degenerative disc disease, spinal stenosis, spinal cord damage, herpetic neuritis, fibromyalgia, coronary artery disease, arthritis, lupus, has a ruptured disc or compression fracture in the neck, and, you know, the chronic fatigue syndrome apart, you know, he has four severe impairments, and yet, you know, somehow he's found not to be disabled. You know, I don't understand it. If I had all those conditions, I don't think I'd be able to get out of bed and function very long. Well, Your Honor, to this point, it's necessary to consider that the simple existence of an impairment is insufficient to prove disability, so although the claimant here does indeed have four severe impairments, without the context of how severe and what actual functionally limiting effects each impairment, in fact, imposes, the simple quantity of impairments is insufficient to prove disability, and this leads into the ALJ's RFC assessment, and the fact that the only medical opinions before the ALJ addressed the plaintiff's both alleged and actual severe impairments and concluded that the plaintiff was still capable of a range of light work, and these were the only opinions before the ALJ to render any, excuse me, any only sources to render any opinion before the ALJ, and the ALJ even said in his decision, in light of the fact that there is no treating source opinion in this record describing the limitations, I give great weight to the state agency consultants, and beyond this, the ALJ even gave some benefit of the doubt to the claimant by further restricting the RFC in line with some of the claimant's testimony, even though the ALJ did not fully credit this testimony, the ALJ nevertheless qualified the RFC by stating that the plaintiff could only stand for one hour before needing to move around and would need to have some level of movement there. He worked for 25 years as a law and maintenance worker? Yes, Your Honor. But he was self-employed? Yes, Your Honor. He didn't have anybody to help him? It's not apparent. So he did a manual job? He did a manual job. For 25 years by himself? I do recall that he, and I may be mixing up this other case. Did he have assistance, or did he do all the law and maintenance himself? I believe he brought in some help for some period to accomplish some task. Let me take a look at that. But basically he was doing the heavy labor? Yes, Your Honor, as far and as near as I can tell from the record. I don't know. There's just something that's not very satisfying about this because you work 25 years as a self-employed law and maintenance worker and you're doing the law and maintenance yourself. It takes a real toll on your joints and muscles. It's hard work day after day. We admit that he has four severe impairments, and yet we somehow come up to the conclusion that he's not disabled, and you might be able to do that on a technical basis. But when you take a step back, you just wonder, is this really the right thing? We talk a lot about who objected to the magistrate's findings and who objected to the ALJ's findings, and that's good. I mean, we should talk about those things. But there's a lot wrong with this fellow, and he's led a demanding life in terms of what his job required of his back and legs. And there's no question he's got a lot wrong with it. I've got just a general comment. I realize I've tried to get into it in a granular way, and I can figure out ways, all kinds of ways to affirm it in a granular way. But when I look back at it, it's kind of disquieting to me. Well, Your Honor, I'm always happy to say something. I mean, the record also reflects, as I recall, that he failed to complete any of the prescribed physical therapy programs. He failed to undertake a mental health evaluation that might have helped substantiate certain symptoms. It's a mixed picture. Yes, Your Honor, and that leads into the point I would like to make here, and that is there is some evidence certainly of impairment, but the substantial evidence standard ultimately defers to the ALJ, and where substantial evidence supports the ALJ's decision, even if the record could conceivably support a different outcome, the ALJ's decision must be given deference in that way. So as long as there is support for the ALJ's decision, and as explained, the ALJ's decision has support, again, only two medical opinions are supporting it. I would like to briefly note that Mr. Lauder's letter that was submitted after the ALJ's decision to the Appeals Council, and this letter does not list forth specific functional restrictions, with the exception that Mr. Lauder believed that the plaintiff could not stand for more than one hour a day, which I would note is inconsistent with the claimant's own testimony and more restrictive than the claimant's own testimony, that he could stand for an hour at a time before needing to move in some regard. So when we're looking at the medical opinions, there's really the support is for the ALJ's outcome here, and in fact the ALJ's RFC was more generous than the only medical opinions before him. Additionally, the plaintiff has levied no express challenge to the ALJ's credibility finding, and as Your Honor Duncan noted, the plaintiff has not pursued physical therapy, at one point noting that he was too busy with work to pursue physical therapy, which the ALJ was properly able to consider in diminishing the credibility of the plaintiff's allegations in terms of the overall impact that had on his ability to function. The ALJ also considered the plaintiff's work history. Now, as Your Honor noted, he's worked for 25 years, but the ALJ expressly took consideration of the earnings in plaintiff's work history and noted that the year of 2006, several years after the alleged onset date, was one of the higher years of earnings in the record. And if you'll look at transcript page 57, that's where it lists out the different earnings in different years. Now, certainly going back to the 70s, inflation would probably raise those somewhat, but all of the numbers were below $10,000, and the year 2006 is the fourth highest year of earnings in that record. So this is not necessarily indicative of someone whose activity has been substantially restricted from earlier times when he was working prior to his alleged onset date, and this is another thing the ALJ was properly able to consider. The ALJ was also able to consider that despite the testimony, the plaintiff was still able to use a weed eater, that there was a record indicating he was still digging holes, that he performed his own maintenance on equipment, and that despite reporting headache and fatigue, Dr. Pierce noted that there was actually no change in his activity in a medical record. Now, I would note that day spring care, which is where plaintiffs saw both Dr. Pierce and Mr. Lauder, has not indicated that his alleged fatigue has worsened over the previous 10-year period, and this is 10 years from 2008, so this would go back into the late 90s, prior to the alleged onset date. And although there are multiple notations of fatigue in the record, these notations are frequently briefly noted, like a mark, what level do you rate your fatigue? Most frequently, that's five. Occasionally, it goes up to seven. Occasionally, it goes down to four. But if you look to the citations that discuss fatigue in the record, they tend to go around five, and they don't tend to elaborate very much. So in looking at the record as it exists, there is not a lot of elaboration on fatigue that would direct the ALJ to discuss this in much more detail in his decision than he actually did. 99.2p does say that persistent muscle tenderness on repeated examinations over the period of six consecutive months establishes the existence of a medically determinable impairment, but it does so in individuals with chronic fatigue syndrome. Is that correct as I'm reading it? I believe so, Your Honor. So you have to ‑‑ in order to establish the existence of a medically determinable impairment, it requires that the individual in question have chronic fatigue syndrome. It doesn't support it. It does seem explicit, Your Honor, yes. And unless I'm mistaken, I don't believe the record actually documents consistently over six consecutive months the muscle tenderness. There was certainly one record that caused concern that this might be something at hand, but, again, that was equivocal. But assuming that it does, it establishes a medical impairment in persons who do have chronic fatigue syndrome. It doesn't establish ‑‑ it proceeds from the assumption that the person has chronic fatigue. Yes, Your Honor. And, again, implicit in the SSR is that other possible causes have to be ruled out. And in this record, that simply never occurred. I'm sorry. Go ahead. In the SSR, did I understand appellant to say that, as currently written, the SSR does not require a diagnosis, but it has been ‑‑ the form has been revised to require diagnosis? Your Honor, the SSR 14.1p rescinded 99.2p, and that changed in several ways, but the general thrust is essentially the same. It mentions diagnosis specifically, but it also ‑‑ I think the greater, more significant change in the second SSR is that there's additional diagnostic criteria that it has to draw upon. These it still doesn't list as exclusive of all possible criteria because it's still evolving, but these include the Canadian consensus criteria and international consensus criteria. So it really is simply getting more specific and bringing in additional medical knowledge that is accumulated over the 15 years between the two SSRs. So that's the primary difference. And, again, both SSRs are ultimately concerned with the notion that of looking to medical diagnostic techniques that are generally looked to to substantiate chronic fatigue syndrome, and here that, again, never occurred because it was sufficiently ambiguous. Dr. Maloney was considering three possible explanations for the allegation of fatigue, so it never really rose to that level. And for the same reason, the district court judge's consideration that it was established as a medical impairment falls short because the district judge not only didn't look to the elevated titer as a specific quantity, but, more importantly, didn't attempt to grapple with the ambiguity and ambivalence of Dr. Maloney and any other source that speculated as to the possibility of chronic fatigue syndrome. And so this court shouldn't follow in that regard. Now, let's see. To briefly distinguish two cases that the claimant appellant cited in the reply brief, Bates and White, those are not analogous to the present case because in Bates there was a diagnosis of chronic pain syndrome, which is distinct, and the ALJ's credibility finding, the court found, was fundamentally flawed, whereas, if you contrast here, the plaintiff didn't really attack the ALJ's credibility finding here in any specificity. Similarly, in White, there was also a diagnosis of chronic fatigue syndrome, and it was well established by the objective evidence there, whereas here that's simply not the case. And, again, moving back to the end of the day, the plaintiff has alleged fatigue, the ALJ addressed the fatigue in the decision, and the ALJ's opinion is supported both by medical opinions, of which there were no contrary opinions before him, as well as the ALJ's credibility finding, which has not been specifically challenged. Thank you, Your Honors. We thank you. Mr. Morton. Mr. Morton, the thing that concerned me about your side of the case is that chronic fatigue syndrome is an awfully vague concept, and it can get out of hand without something concrete behind it. And, you know, there are an awful lot of people that experience chronic fatigue. I would suspect that they number in the tens of millions. And, you know, and so what's troubling is, you know, how do you differentiate chronic fatigue syndrome from the chronic fatigue that everybody, you know, experiences periodically and some people experience chronically. Yeah, chronically. But, you know, it's really the sort of fuzzy, indefinite kind of a complaint that without something concrete to back it up and differentiate it from a widely experienced condition, it can just sort of be totally open-ended. And that was the greatest concern that I had about your side of the case, is I just thought we ought to have something a little more specific to pin this down with. Well, that's why we have a ruling that provides the medical signs and laboratory findings that are sufficient to establish precisely that. When the commissioners counsels... Yes, and that's why I think Radford applies, because Radford requires an ALJ to analyze the evidence of chronic fatigue. But, I mean, you know, the magistrate judge and the ALJ differed here on the chronic fatigue syndrome, and the ALJ didn't think it was present. Well, the ALJ never... The commissioners counsel said that the district court didn't grapple with the ambiguity of Dr. Maloney's opinions, but neither did the ALJ, and that's the issue. The ALJ simply did not review the medical signs and laboratory findings, the evidence in this case, that established this was a medically determinable impairment. But the ALJ did deal with the question of fatigue. All the ALJ... Again, all the ALJ said was there's no diagnosis of chronic fatigue in the file, but the ruling itself doesn't require that diagnosis, and the ruling itself gives the ALJ guidance as to how to evaluate it. But didn't the ALJ address the condition of fatigue? No. All the ALJ said, well, he acknowledged that my client testified he had fatigue, he said there's no diagnosis of chronic fatigue in the file, and I think he referred to one other office note where my client said he had fatigue and pain, but his activity level remained unchanged. That's the sum total of what the ALJ had to say about fatigue. And the way you differentiate a person who has... So what are you asking us to do, to send it back and have the ALJ... Evaluate it according to the ruling. Evaluate, well, what does that mean? Because there's some argument about what the rule actually requires. Well, I think what we have, Your Honor... I don't think it requires a diagnosis, but your opposing counsel said, well, it does require something close to a diagnosis. What I'm asking the court to do, I think we have established under 99-2P that Mr. Bowers had a medically determinable impairment of chronic fatigue syndrome. You want us to remand... It doesn't say that, though. I know the word syndrome isn't in there. No, no, I mean, it doesn't. It says medically determinable impairment in a person with chronic fatigue syndrome. But then the ruling itself says that the diagnosis of chronic fatigue syndrome made by a physician isn't sufficient. So that would suggest to me that if a physician is treating chronic fatigue over a prolonged period of time and you have these medical signs or laboratory findings, you've established, because, again, the ruling could say a physician must diagnose chronic fatigue syndrome and then there must be medical signs or laboratory findings or both. It does say that any diagnosis must exclude other causes. And there is no evidence of any other causes for Mr. Bowers' fatigue. What's that Epstein? Epstein-Barr virus. That's it. Speculate on that possibility, which isn't... It wasn't a speculate. He said it was significantly elevated titer, which is one example of a laboratory finding that can establish... That's an alternative to the syndrome. In other words, the ruling... No, no, no, no, it's not an alternative, Your Honor. It's evidence of the syndrome. It's evidence that it is a medically determinable impairment. We're just trying... If the court can find that we have established a medically determinable impairment, then under Radford it's the responsibility of the ALJ in the first instance to evaluate whether that impairment is severe, and if it is, what limitations should be included in my client's residual functional capacity. A physician should make a diagnosis of CFS only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded. Right. And I'm not sure I found that anywhere. The physician treated chronic fatigue. It is true that no physician said chronic fatigue syndrome. It's not syndrome. I think the ruling does presume a diagnosis. They talk about the diagnosis, what it has to include, what it can include, what it relies on, has to be supported, and it uses the word diagnosis. But set that aside. It says any physician should make a diagnosis only after alternative and psychiatric causes, et cetera, have been excluded. And it seems to me there's a particularized finding in order to exclude. Because of the things that Judge Wilson observed, chronic fatigue is such a generalized condition that in order to get to the syndrome itself that's been defined by the respective authority to the CDC or whoever, you have to focus it and exclude other causes, and you have to have medical support for it. And the ALJ discussed none of that in his decision. No, because there wasn't a diagnosis in here that reached the diagnosis and said this is the syndrome, and it's not caused by any other medical cause. Do we need to cross on the question of whether the chronic fatigue syndrome requires a formal diagnosis or not, or can we allow the ALJ to wrestle with that in the first instance and the appellate body to wrestle with that in the first instance and just say there was not a sufficient explanation given as to whether chronic fatigue syndrome was present or whether it wasn't, that we would like some more explanation about that? Right. I think that's what Radford requires, Your Honor. Pardon me? I think that's precisely what Radford requires, that the ALJ provide an explanation for why he discounted certain types of evidence. The question of the reasoning, I don't really know exactly at this point whether it requires a formal diagnosis. It would certainly help a great deal. Sure, yes. I'm nervous about how open-ended the thing is, but I'm not sure I need to get into all of that. But we could say that a question has been presented, but whether chronic fatigue syndrome is present or not is a very difficult thing to determine without some further explanation on the part of the fact-finder. Precisely. I would agree with that. That might be an intermediate step. Yes. Okay. Thank you, Your Honor. Thank you. We appreciate both of your arguments very much. We will adjourn court and come down to say hello. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Allyson K. Duncan